

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | INDICTMENT 15 CR 335 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. JUDGE GAUGHAN |
| ) | Title 18, United States Code, |
| WILLIAM SCHOLANDER, ) | Sections 1343, 1348, and 1349 |
| TALMAN HARRIS, ) | |
| JACK TAGLIAFERRO, ) | |
| VICTOR ALFAYA, and ) | |
| JUSTIN ESPOSITO, ) | |
| ) | |
| Defendants. | |

The Grand Jury charges:

## I.      GENERAL ALLEGATIONS

At all times relevant to this Indictment, except where otherwise noted:

A.      Defendants, Relevant Entities, and Bank Accounts

1.      Defendant WILLIAM SCHOLANDER was a resident of New York, New York.

SCHOLANDER was a registered broker, Financial Industry Regulatory Authority ("FINRA")

Central Registration Depository Number 2938044.

2.      Defendant TALMAN HARRIS was a resident of New York, New York.

HARRIS was a registered broker, FINRA Central Registration Depository Number 3209947.

3.     SCHOLANDER and HARRIS were registered brokers with the following securities firms:  New York Global Securities, Inc. in New York, New York; Legend Securities, Inc. in New York, New York; Basic Investors, Inc. in New York, New York; Martinez-Ayme Securities, Inc. in New York, New York; Seaboard Securities, Inc. in New York, New York; First Merger Capital, Inc. in New York, New York; and Radnor Research & Trading Company, LLC in New York, New York.

4.     Defendant JACK TAGLIAFERRO was a resident of Stevenson Ranch, California and Glen Cove, New York.  TAGLIAFERRO was a registered broker, FINRA Central Registration Depository Number 2714131, until he stopped working as a licensed broker in September 2011.  TAGLIAFERRO worked for the following securities firms:  Woodstock Financial Group, Inc. in Melville, New York; Marquis Financial Services, Inc. in Tarzana, California; and Rockwell Global Capital, LLC in Melville, New York.

5.     Defendant JUSTIN ESPOSITO was a resident of Thornwood, New York. ESPOSITO was not a licensed FINRA investment broker.  He worked at Small Cap Financial Resource ("Small Cap Resource") in Port Washington, New York.

6.     Defendant VICTOR ALFAYA was a resident of New York, New York. ALFAYA was not a licensed FINRA investment broker.  He worked at Small Cap Resource in Port Washington, New York.

7.     Bridges Investments, Inc. ("Bridges") was a Nevada corporation with its principal place of business at 9 Via Del Garda, Henderson, Nevada 89011.  Bridges was formed in or around April 2005.  Angelique D. was the president, director, and secretary of record, but Zirk de Maison maintained de facto control of the business and the stock trades and transactions.

8.      Suprafin, Ltd. ("Suprafin") was a Wyoming corporation with its principal place of business at 1621 Central Avenue, Suite 3380, Cheyenne, Wyoming 82001. Suprafin was formed in approximately 2009. Zirk de Maison was the president and vice president of Suprafin.

9.      Sunatco, Ltd. ("Sunatco") was a Wyoming corporation with its principal place of business at 1621 Central Avenue, Cheyenne, Wyoming 82001. Sunatco was formed in approximately 2013. Zirk de Maison was the chairman and chief executive officer of Sunatco.

10.     Wealthmakers, Ltd. ("Wealthmakers") was a Wyoming corporation with its principal place of business at 1005 S. Center Street, Redlands, California 92373. Wealthmakers was formed in approximately 2007. Thomas R. was the president, and Zirk de Maison was the vice president of Wealthmakers.

11.     Walker River Investments Corp. ("Walker River") was a Wyoming corporation with its principal place of business at 2510 Warren Avenue, Cheyenne, Wyoming 82001. Walker River was formed in approximately 2011. Margaret J. was the president of Walker River, but Zirk de Maison maintained de facto control of the business.

12.     Marquis Financial Services of Indiana, Inc. ("Marquis") was a corporation organized under the laws of the State of Wisconsin with its principal place of business in Encino, California. Marquis was a member of, and regulated by, FINRA (as Central Registration Depository Number 20733), as well as other stock, option, and commodity exchanges and self-regulatory organizations.

13.     Merrimen Investments, Inc., ("Merrimen") was a Wyoming corporation with its principal place of business at 10409 Strathmore Drive, Santee, California 92071. Merrimen was formed in approximately 2010. Zirk de Maison was the principal of Merrimen until in or around 2012.

3

14.     Worldbridge Partners, Inc. ("Worldbridge") was a Nevada corporation with its principal place of business at 29191 Weybridge Drive, Westlake, Ohio 44145. Worldbridge was formed in approximately 2009. Jason Cope was the president, and Louis M. was the vice president, of Worldbridge.

15.     Structured Management, Inc. ("SMI") was a Nevada corporation with its principal place of business at 29191 Weybridge Drive, Westlake, Ohio 44145. SMI was formed in approximately 2003. Jason Cope was the president and director of SMI.

16.     Small Cap Resource was a New York corporation with its principal place of business at 14 Vanderventer Avenue, Suite 138, Port Washington, New York 11050. Small Cap Resource was formed in approximately 2011. Kieran Kuhn was the president of Small Cap Resource.

17.     SB3, LLC ("SB3") was a Wyoming corporation with its principal place of business at 10409 Strathmore Drive, Santee, California 92071. SB3 was formed in approximately 2007. Michael L. was the organizer of SB3, but Zirk de Maison maintained and controlled the bank accounts in the name of SB3.

18.     Esposito Consulting Corp. ("Esposito Consulting") was a New York corporation with its principal place of business at 100 Eton Road, Thornwood, New York 10594. Esposito Consulting was formed in approximately 2012. Defendant ESPOSITO was the principal of Esposito Consulting.

19.     Neoterra Enterprises, LLC ("Neoterra") was a New York corporation with its principal place of business at 3 Glen Lane, Woodstock, New Jersey 12498. Neoterra was formed in approximately 2010. Kona Jones Barbera was the principal of Neoterra.

20.     Traverse International ("Traverse") was a Nevada corporation with its principal place of business at 2360 Corporate Circle, Suite 400, Henderson, Nevada 89074. Traverse was formed in approximately 2012. Louis M. was the president of Traverse.

21.     Kensington & Royce, Ltd ("Royce") was a Nevada corporation with its principal place of business at 646 W. Highland Avenue, Redlands, California 92373. Royce was formed in approximately 2006. Angelique D. was the president of Royce, but Zirk de Maison maintained de facto control of the business.

22.     Global Marketing Consultants, Inc. ("Global Marketing") was a Wyoming corporation with its principal place of business at 2710 Thomes Avenue, Cheyenne, Wyoming 82001. Global Marketing was formed in approximately 2009. Paul C. was the principal of Global Marketing.

23.     Since at least on or about January 1, 2007, bank account number x1581 at City National Bank was opened in the name of Royce.

24.     On or about January 16, 2008, bank account number x7565 at City National Bank was opened in the name of SB3.

25.     On or about February 26, 2008, Angelique D. opened, and caused to be opened, bank account number ending in x9297 at Washington Mutual Bank, NA, later acquired by JP Morgan Chase ("JPMC"), in the name of Bridges. Angelique D. and Trisha M. were listed on the signature card for this account.

26.     On or about July 23, 2008, bank account number ending in x8413 at City National Bank was opened in the name of Wealthmakers. A superseding signature card for this account listed Trisha M. as secretary and Charlotte H. as the non-signatory president of the company.

27.     On or about April 2, 2009, Paul C. opened, and caused to be opened, bank account number ending in x2298 at JPMC, in the name of Global Marketing.  Paul C. was listed on the signature card for this account.

28.     On or about December 7, 2009, Zirk de Maison opened, and caused to be opened, bank account number ending in x9320 at Wachovia Bank, later acquired by Wells Fargo Bank ("Wells Fargo"), in the name of Suprafin.

29.     On or about August 9, 2011, Kieran Kuhn opened, and caused to be opened, bank account number ending in x3820 at JPMC in the name of Small Cap Resource.  A signature card for this account listed Kieran Kuhn as the president of Small Cap Resource and the sole signatory for the account.

30.     On or about January 20, 2012, Louis M. opened, and caused to be opened, bank account number ending in x5234 at Fifth Third Bank in the name of Traverse.

31.     On or about June 28, 2012, Zirk de Maison opened, and caused to be opened, bank account number ending in x8503 at U.S. Bank in the name of Suprafin.

B.     The Relevant Publicly Traded Companies

32.     Lenco Mobile, Inc. ("Lenco") was incorporated in the State of Delaware in 1999 under the name Schochet Holdings Corporation.  On or about February 20, 2009, after also using the company names CIC Holding Company, Inc., Global Wear, Ltd., and Sovereign Wealth Corporation ("Sovereign Wealth"), the company changed its name to Lenco.  It had offices in Santa Barbara, California.  When the company was named Sovereign Wealth, the common stock traded under the symbol "SOVW," and its purported business purpose was the same as when it used the name Lenco; that is, the management of technology solutions for brand owners and mobile telephone network operators.  Lenco's stock traded under the symbol "LNCM."

33.     Kensington Leasing, Ltd. ("Kensington") was incorporated in the State of Nevada on or about June 27, 2008, with offices in Redlands, California. Kensington purported to specialize in leasing equipment to legal, medical, and real estate professionals. Kensington's common stock traded under the symbol "KNSL."

34.     Casablanca Mining, Ltd. ("Casablanca") was incorporated in the State of Nevada on or about June 27, 2008, under the original name of USD Energy Corporation ("USD"). On or about February 17, 2011, the company changed its name to Casablanca. Casablanca had offices in Santee, California. When Casablanca was named USD, the common stock traded under the symbol "UEGY," and its purported business purpose was exploration stage oil and gas production. After changing to Casablanca, the purported business purpose switched to the acquisition, exploration, development, and operation of precious metal properties in Chile. Casablanca's stock traded under the symbol "CUAU."

35.     Lustros, Inc. ("Lustros") was incorporated in the State of Utah on or about July 30, 1980, under the name MAG Enterprises, Inc. On or about April 12, 2012, after also using the company names Safari Associates, Inc. and Power-Save Energy Company, the business changed its name to Lustros. Lustros had offices in Redlands, California. Under the name Lustros, the purported business purpose was the production of food grade copper sulfate. Lustros' stock traded under the symbol "LSTS."

36.     Gepco, Ltd. ("Gepco") was the latest corporate iteration of the company that started out as Kensington. After abandoning the equipment leasing business under Kensington, the company changed its name to Wikifamilies, Inc. with the purported business purpose of designing, developing, and operating a social media website. After a failed merger with ClairNET, Ltd., the company was abandoned until reclaimed through court proceedings that

7

appointed Trisha M. as the custodian of the company. On or about September 11, 2013, the company changed its name to Gepco. The purported business purpose of Gepco was to sell and broker high-end investment grade diamonds obtained from wholesale diamond cutters. Gepco's common stock traded under the symbol "GEPC."

37.     Stock for Lenco, Kensington, Casablanca, Lustros, and Gepco (the "Manipulated Public Companies") was quoted on OTC Markets, Inc. ("OTC Markets"), an inter-dealer quotation service that provided quotations, prices, and financial information for certain over-the-counter securities and issuers. Companies trading on OTC Markets tended to be extremely small, and the stock in those companies tended to be closely held (that was, owned by a small number of individuals) and thinly traded (that was, traded far less frequently than stocks in larger companies on larger exchanges).

C.     The Roles in the Manipulated Public Companies

(i)     Zirk de Maison

38.     Zirk de Maison, aka Zirk Engelbrecht, a separately charged co-conspirator, was a resident of Redlands, California and Seattle, Washington. For each of the Manipulated Public Companies, Zirk de Maison controlled a substantial number of outstanding shares from the outset through his personal companies, co-conspirators, and associates over which he had influence and control. Zirk de Maison used co-conspirators to have restrictions removed from the outstanding shares, making the shares free trading on the open markets. Zirk de Maison then combined with Defendants and others to inflate the value of the shares through manipulative trading techniques. Once the stock price was inflated, Zirk de Maison, Defendants, and others, identified and solicited investors to purchase their shares of the Manipulated Public Companies

in the open market and through private placement transactions in exchange for commission payments that were concealed from the investors.

(ii)     Consultants

39.     Zirk de Maison used consultants to access wealthy potential investors that the consultants had developed as contacts and clients over time.  Zirk de Maison paid undisclosed commissions of cash and stock to the consultants when they persuaded their clients to purchase Zirk de Maison's shares in the Manipulated Public Companies.

40.     Jason Cope, a separately charged co-conspirator, was a resident of Gates Mills, Ohio and a former broker who later purported to consult almost exclusively for Zirk de Maison's Manipulated Public Companies.  Effective on or about May 27, 2003, FINRA barred Jason Cope from association with any FINRA member in any capacity.  Jason Cope solicited potential investors to purchase stock in the Manipulated Public Companies without disclosing that he received commissions from Zirk de Maison, that it was Zirk de Maison's and Jason Cope's shares his clients were purchasing, and that Jason Cope's clients' investments were used to enrich the co-conspirators.  Zirk de Maison, Jason Cope, and others, agreed to use private placements, stock promoters, and non-arms-length trading with related parties to create the illusion of volume, to inflate the stock price, and to divest their own shares.

41.     Louis M. was a resident of Bay Village, Ohio, and a registered broker with FINRA.  Louis M. worked for companies controlled by Jason Cope.  Louis M. provided false documentation to Jason Cope to assist with the deposit and sale of securities for the benefit of Jason Cope and the other co-conspirators.  Louis M. also created his own entities to assist Jason Cope in the deposit and sale of shares in the Manipulated Public Companies and to transfer money to overseas brokerage accounts.

(iii)    Registered Brokers

42.     Zirk de Maison used registered brokers to liquidate free trading shares of stock in the Manipulated Public Companies. Zirk de Maison paid the registered brokers' undisclosed commissions for purchasing his shares of the Manipulated Public Companies.

43.     SCHOLANDER, a resident of New York, New York, was registered as a broker with FINRA. SCHOLANDER worked for seven different New York-based securities firms from in or around 2007 to in or around 2014. SCHOLANDER received undisclosed commissions from Zirk de Maison in exchange for using client funds to purchase Zirk de Maison's shares in the Manipulated Public Companies.

44.     TAGLIAFERRO, a resident of Glen Cove, New York, was registered as a broker with FINRA. From in or around July 2010 to in or around September 2011, TAGLIAFERRO was employed as a broker by Marquis at its office in Tarzana, California. TAGLIAFERRO received undisclosed commissions from Zirk de Maison in exchange for using client funds to purchase Zirk de Maison's shares in the Manipulated Public Companies.

45.     HARRIS, a resident of New York, New York, was registered as a broker with FINRA. HARRIS worked for seven different New York-based securities firms from in or around 2007 to in or around 2014. HARRIS received undisclosed commissions from Zirk de Maison in exchange for using client funds to purchase Zirk de Maison's shares.

46.     Gregory Goldstein, a separately charged co-conspirator, was a resident of Stevenson Ranch, California, and registered as a broker with FINRA. From in or around July 2001 to in or around February 2013, Gregory Goldstein was employed as a broker by Marquis, a broker-dealer registered with the SEC and FINRA, at its office in Tarzana, California. Gregory Goldstein was the controlling member of Marquis. Goldstein received undisclosed commissions

from Zirk de Maison in exchange for using client funds to purchase Zirk de Maison's shares in the Manipulated Public Companies.

47.     Stephen Wilshinsky, a separately charged co-conspirator, was a resident of Woodland Hills, California, and registered as a broker with FINRA.  Wilshinsky worked as a registered broker with Oppenheimer & Co. ("Oppenheimer") from in or around November 2004 to in or around March 2009, and with Marquis at its office in Tarzana, California, from in or around April 2009 to in or around June 2011.  Wilshinsky received undisclosed commissions from Zirk de Maison in exchange for using client funds to purchase Zirk de Maison's shares in the Manipulated Public Companies.

(iv)     "Boiler Room" Promoters

48.     Co-conspirators also used promoters in so-called "boiler rooms" to cold call and solicit potential investors to purchase shares of the Manipulated Public Companies.  Zirk de Maison dictated what stocks the promoters pushed.  The cold calls to potential investors typically coincided with favorable press releases or other information that Zirk de Maison caused to be released.  The boiler room promoters touted the Manipulated Public Companies using high pressure sales tactics and misrepresentations about the value of the Manipulated Public Companies and their stock.  The boiler room promoters did not disclose that Zirk de Maison and Jason Cope paid them commissions on the sale of their stock to the investors, either on the open market or through private placements.

49.     Kieran Kuhn, a separately charged co-conspirator, was a resident of Port Washington, New York, and registered as a broker with FINRA.  Kieran Kuhn started his own business, Small Cap Resource, which functioned as a boiler room and was in the business of stock promotions.

50. ALFAYA, a resident of Port Washington, New York, was an employee of Small Cap Resource. ALFAYA cold called potential investors and was paid undisclosed commissions from Zirk de Maison through Kieran Kuhn on the sales of stock he made in the Manipulated Public Companies.

51. ESPOSITO, a resident of Thornwood, New York, was an employee of Small Cap Resource. ESPOSITO cold called potential investors and was paid undisclosed commissions from Zirk de Maison through Kieran Kuhn on the sales of stock he made in the Manipulated Public Companies. ESPOSITO directed that such payments be made to Esposito Consulting, an entity he controlled.

52. Kona Jones Barbera, a separately charged co-conspirator, was a resident of Asheville, North Carolina and Glen Cove, New York, and an employee of Small Cap Resource. Kona Jones Barbera cold called potential investors and was paid undisclosed commissions from Zirk de Maison through Kieran Kuhn on the sales of stock he made in the Manipulated Public Companies. Kona Jones Barbera directed that his commissions be made to Neoterra, an entity he controlled.

(v)   Attorneys

53. Zirk de Maison's attorneys provided legal opinions under Title 17, Code of Federal Regulations, Section 230.144, among others, often referred to as Rule 144, for Zirk de Maison and his co-conspirators. The Rule 144 legal opinions contained misrepresentations about the relationship between the customer and the issuer, the customer and an affiliate of the issuer, the consideration paid (if any), and other misrepresentations. Zirk de Maison provided the Rule 144 legal opinions to brokerage houses and transfer agents to satisfy legal requirements about depositing the stock and lifting restrictions.

D.    The SEC and Securities Regulations

54.    The United States Securities and Exchange Commission (the "SEC") was an independent agency of the United States which was charged by law with protecting investors by regulating and monitoring, among other things, the purchase and sale of publicly traded securities, including securities traded on the United States-based stock exchanges.  Stock for the Manipulated Public Companies was registered with the SEC.

55.    Federal securities laws and regulations prohibited fraud in connection with the purchase and sale of securities, including the use of false and misleading statements and the failure to disclose material information to:  (a) the SEC in publicly available filings; (b) brokerage firms and transfer agents involved in the purchase and sale of stock in companies subject to SEC regulation; and (c) the public.  Federal securities laws and regulations also prohibited the manipulation of stock through, among other things, sales made at the times and at prices set by those trading the stock rather than by market forces.

56.    Title 15, United States Code, Section 78j(b), made it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange, to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe as necessary or appropriate in the public interest or for the protection of investors, including:  (a) employing devices, scheme, and artifices to defraud; (b) making untrue statements of fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c) engaging in acts, practices, and courses of business which operated as a fraud upon investors, in connection with the purchase and sale of the securities.

57.     Failure to disclose to investors, commission payments from third parties, including payments from issuers, was considered an omission of a material fact as part of a securities transaction.

58.     The Financial Industry Regulatory Authority ("FINRA") was an independent regulator for securities firms doing business in the United States.  FINRA oversaw brokerage firms and wrote and enforced rules governing their conduct.

59.     A securities depository and clearing agency settled trades in securities.  One of the services provided by such agencies was the "Deposit and Withdrawal at Custodian" program ("DWAC"), which facilitated the electronic transfer of securities between brokers and accelerated the speed at which shares could be transferred between buyers and sellers.

F.     Relevant Regulatory Principles and Definitions

60.     "Microcap" or "penny" stocks referred to stocks of publicly traded U.S. companies which had a low market capitalization.  Microcap stocks were subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that were traded on notable exchanges such as the National Association of Securities Dealers Automated Quotations ("NASDAQ") and the New York Stock Exchange ("NYSE").  NASDAQ and NYSE had specific standards that were monitored and enforced for a company to have its stock traded on those exchanges.  Additionally, large blocks of microcap stock were often controlled by small groups of individuals, which enabled those in the group to control and orchestrate manipulative trading in those stocks.

61.     "Wash trades" were purchases and sales of securities that matched each other in price, volume, and time of execution, and involved no change in beneficial ownership.  For

14

example, a wash trade took place when Investor A bought 100 shares at $5.00 per share of a company through Broker A while simultaneously selling 100 shares at $5.00 per share of the company through Broker B.

62.  "Matched trades" were similar to wash trades, but involved a related third person or party who placed one side of the trade.  For example, a matched trade took place when Investor A bought 100 shares at $5.00 per share of a company through a broker, while Investor B, who coordinated with Investor A, simultaneously sold 100 shares at $5.00 per share of the company through a broker.

63.  "Marking the close trades" involved attempting to influence the closing price of a security by executing purchase or sale orders at or near the close of normal trading hours.  Such activity could artificially inflate or depress the closing price for the security.

64.  Wash trades, matched trades, and marking the close trades were used to create the appearance that the stock price and volume raised as a result of genuine market demand for the securities.

65.  Market manipulation schemes known as "pump and dump" schemes involved creating a price for a security that was not reflective of true market value, allowing co-conspirators holding large blocks of the inflated stock to sell shares they obtained for little or no money at the inflated price.  The purchasing party was left with a near-worthless security when the price dropped to accurately reflect the companies' true value, or lack thereof, in the market. There were generally three phases to a pump and dump scheme:

a.  First, obtaining and concealing control of a significant portion of a publicly traded company's stock;

15

b.      Second, fraudulently inflating or keeping inflated the price and trading volume of the company's stock through a variety of means; and

c.      Third, once the price of the stock was fraudulently inflated, selling the stock using the fraudulently inflated price as a benchmark, thereby profiting at the expense of the investing public.

(i)      First Phase: Obtaining and Concealing Control and Ownership of a Public Company's Shares

66.      During the first phase of a pump and dump scheme, the perpetrators obtained control over a substantial portion of the shares of a public company, both free trading and restricted. Generally, "free trading" shares were shares of stock that the shareholder could trade without regulatory restrictions. Perpetrators could profit from selling these shares in the market to buyers not knowledgeable about the true value of the company. Restricted shares could not be traded on the market, but could be transferred through private placement transactions. Typically, such shares must be held for a specific period of time before the restriction was removed and the shares became free trading. Perpetrators could profit by selling restricted shares directly to buyers at a discount from the quoted market price of the free trading shares.

67.      The perpetrators of a pump and dump scheme usually took steps to conceal from the investing public their control over a substantial portion of the company's shares. Rules and regulations required the disclosure of the identities of all shareholders who owned or controlled more than a percentage (usually five percent) of a company's stock. To thwart such regulations, the perpetrators of pump and dump schemes often hid their control over the company's stock by purporting to transfer ownership of the shares to various nominee entities and individuals who they, in fact, controlled. Accordingly, even if they did not hold the shares in their own names, the perpetrators maintained actual control over the disposition of shares.

16

(ii)    Second Phase:  Fraudulently Inflating the Price and Trading Volume of the
Company's Stock

68.    During the second phase, the perpetrators fraudulently inflated or kept inflated the

price and trading volume of the company's stock.  The perpetrators typically used some or all of

the following methods to generate interest in the company and fraudulently raised the price and

trading volume of the company's stock:

a.    The perpetrators paid stock promoters and analysts to recommend the

company's stock to the investing public.  The promoters recommended the stock through a

variety of methods, including mass mailings and e-mails, Internet chat rooms, Internet

advertising, and boiler room operations.  The analysts, who often purported to offer independent

and unbiased analysis of the company's stock to the investing public, touted the stock as

underpriced and set unrealistically high price targets for the stock.

b.    Using an account that they controlled (either in their own names or in the

names of nominees), the perpetrators bought and sold the company's stock back and forth among

themselves, often at increasingly higher prices, to create the false appearance that there was a

high demand for the stock.

(iii)    Third Phase:  Coordinated Selling of the Company's Stock

69.    During the third phase, the perpetrators sold their shares of the company's stock

in coordination to maximize their fraudulent profits from the scheme.  Eventually the dumping of

such a significant number of shares, combined with the lack of any actual profitable business

activity at the company to justify the inflated price, caused the price of the shares to drop

significantly leaving investors who bought at the fraudulently inflated price holding shares of

stock worth substantially less than what was paid for the shares.

## II.   FACTUAL ALLEGATIONS

70.     From on or about September 28, 2006, through on or about September 18, 2014, Defendants, together with others known and unknown to the Grand Jury, agreed to defraud investors and potential investors in the Manipulated Public Companies by issuing millions of shares to themselves at little or no cost and then artificially controlling the price and volume of traded shares through, among other means:  (a) paying undisclosed commissions to the co-conspirators for directing client funds to make both authorized and unauthorized investments and soliciting investors; (b) fraudulently concealing the co-conspirators' ownership interests in the Manipulated Public Companies; and (c) engineering price movements and trading volume in the stocks.

### G.   The Lenco Manipulation Scheme

#### (i)   Control of the Stock

71.     Lenco originated as a public company in 1999 under the name of Shochet Holdings Corporation ("Shochet"), which purportedly provided financial services.  After Shochet changed its name to Sutter Holdings Company, Inc. ("Sutter"), the primary business focus was on mortgage origination.  By on or about December 31, 2005, Sutter ceased its business operations.  In or around November 2006, the company changed its name to CIC Holding Company, Inc., in which Zirk de Maison was the president and Angelique D. a director.  Zirk de Maison and Angelique D. personally held over 3,000,000 shares each of CIC Holdings before the transformation of the company into Lenco.

72.     Zirk de Maison obtained control of shares in Lenco and its predecessor using a variety of associates and other companies.  For example, on or about October 31, 2007, Zirk de Maison caused Lenco to issue 210 shares of Preferred Series B stock to Angelique D.  Then, on

or about April 8, 2008, Angelique D. converted 42 shares of Preferred Series B stock to 2,100,000 common shares. On or about April 18, 2008, Zirk de Maison caused Lenco to issue a total of 772,000 shares of common stock to Bridges and Angelique D. On or about May 9, 2008, Zirk de Maison caused Lenco to issue Trisha M. and Stephen B., two of Zirk de Maison's associates, 800,000 shares of common stock.

(ii)    The Fraudulent Stock Manipulations

73.    After gaining control of Lenco's unrestricted common stock, Zirk de Maison, together with others, devised and intended to devise a scheme whereby they fraudulently inflated Lenco's share price and trading volume and then orchestrated the sale and purchase of the unrestricted Lenco stock at a profit when the share price reached desirable levels.

74.    It was a part of the conspiracy to raise the stock price through manipulative stock trading techniques to a level beneficial to the co-conspirators. Brokers purchased public shares using accounts belonging to clients, some of whom were unaware that they held the stock. This fraudulent arrangement reduced the possibility that the stock would be subsequently resold in the market, which gave the co-conspirators control over the trading activity and kept the price artificially inflated for an extended period on OTC Markets quotes. SCHOLANDER, HARRIS, TAGLIAFERRO, Stephen Wilshinsky, and Gregory Goldstein used their positions as registered brokers to purchase Zirk de Maison's shares in Lenco through their client accounts.

75.    The first Lenco pump started on or about March 7, 2008, with the co-conspirators using a combination of matched trades, wash trades, and marking the close trades to inflate the stock price. During this first period, the co-conspirators manipulated Lenco's stock price by raising it from a low of approximately $0.10 per share (with trading volume of approximately 5,000 shares per day) in or around March 2008 to a high of approximately $4.95 per share (with

trading volume of approximately 327,840 shares per day) just a month later on or about April 25, 2008.

76.     Because many of the outstanding shares were restricted, the price did not drop when the co-conspirators stopped pumping up the stock. Approximately one year later, on or about March 6, 2009, however, when restrictions began to lift, the share price was quoted at approximately $3.00 per share. After another pump cycle, in or around November 2011, the stock eventually dropped to approximately $0.24 per share.

77.     The value of Lenco's stock had little or no relation to its then current and future earnings potential or business operations. At its highest closing price of approximately $6.50 per share on or about July 25, 2008, Lenco's market capitalization was approximately $418,007,037 based on approximately 64,308,775 shares outstanding. However, on or about November 9, 2009, Lenco filed a form with the SEC, signed by Lenco's president, reporting that as of December 31, 2008, Lenco had only $2,854,041 in total assets (including intangibles such as "goodwill"), $805,085 in total liabilities, and $781,420 claimed in net income for the year ended December 31, 2008.

H.     The Kensington Manipulation Scheme

        (i)     Control of the Stock

78.     Kensington originated as a public company in or around 2009 with a purported focus on leasing equipment to real estate professionals. According to an SEC filing, on or about January 15, 2009, Angelique D. was the chief executive officer, though Zirk de Maison maintained de facto control of the business, and Gregory Goldstein was the chief financial officer. In an amended filing on or about March 25, 2009, Gregory Goldstein was replaced as chief financial officer by Landre M., the husband of Zirk de Maison's personal assistant.

79.     Initially, Zirk de Maison caused the issuance of only 20,000 shares of stock to Angelique D.  Through a purchase agreement dated on or about April 9, 2010, Zirk de Maison caused Angelique D. to gain an additional 6,000,000 shares, purportedly in exchange for approximately $480,000.  Zirk de Maison also orchestrated purchase agreements whereby one of his companies, Merrimen, entered into a purchase agreement with Kensington with an option to buy up to 24,000,000 shares.  On or about November 9, 2010, Zirk de Maison caused Merrimen to exercise a portion of the option to purchase 2,500,000 shares of Kensington.  Zirk de Maison distributed the purchased shares as gifts.  On or about November 9, 2010, Zirk de Maison gifted approximately 1,011,184 shares.  On or about December 7, 2010, Zirk de Maison gifted approximately 1,488,816 shares.

80.     On or about December 1, 2010, Zirk de Maison caused Merrimen to sell the right to purchase the remaining 21,500,000 shares to Angelique D.

(ii)     The Fraudulent Stock Manipulations

81.     After gaining control of Kensington's unrestricted shares, Zirk de Maison, together with others, devised and intended to devise a scheme whereby they fraudulently inflated Kensington's share price and trading volume and then orchestrated the sale and purchase of the unrestricted Kensington stock at a profit when the share price reached desirable levels.

82.     The co-conspirators sought to manipulate the Kensington stock through manipulative stock trading techniques to a price beneficial to the co-conspirators.  Having created the company, the co-conspirators controlled a majority of the shares outstanding, enabling them to manipulate the share price.  Those public shares were typically purchased by brokers using accounts belonging to clients.  SCHOLANDER, HARRIS, TAGLIAFERRO,

Stephen Wilshinsky, and Gregory Goldstein used their positions as registered brokers to purchase Zirk de Maison's shares in Kensington through their client accounts.

83.     The first Kensington pump started on or about March 29, 2010. That day, Trisha M., at the direction of Zirk de Maison, sold 40,000 shares. Those shares were purchased almost exclusively in client accounts controlled by Stephen Wilshinsky at Marquis. During this first period, the co-conspirators manipulated Kensington's stock price by setting it at a price of approximately $3.80 per share (with trading volume of approximately 10,500 shares that day).

84.     The value of Kensington's stock had little or no relation to its then current and future earnings potential or business operations. On or about September 29, 2010, Kensington's market capitalization at its closing price of approximately $4.50 per share was approximately $35,550,000 based on approximately 7,900,000 shares outstanding. However, on or about November 22, 2010, Kensington filed a form with the SEC, signed by Trisha M., stating as of on or about September 30, 2010, Kensington had approximately $935,249 in total assets (including for intangibles such as "goodwill"), $374,441 in total liabilities, and $4,071 in revenue since the inception of the business. The form indicated a net loss of $83,122 since inception. On or about September 4, 2012, the stock had fallen to $0.02 per share.

I.     The Casablanca Manipulation Scheme

(i)     Control of the Stock

85.     Casablanca originated as a public company in or around 2011 with a purported focus on mining precious metals in Chile. According to an SEC filing, on or about March 31, 2011, Zirk de Maison was the president of Casablanca, and Trisha M. was the former chief executive officer.

86.     Upon formation as USD, Casablanca's predecessor company, Zirk de Maison caused the issuance of 600,000 shares of stock to Trisha M. in consideration of purported set up costs.  Through a purchase agreement dated on or about December 7, 2010, Zirk de Maison, Angelique D., Thomas R., and companies controlled by Zirk de Maison, collectively purchased from USD approximately 21,500,000 shares of stock for the purported amount of $1,100,000. On or about January 19, 2011, Zirk de Maison caused Casablanca to issue approximately 800,000 shares of stock to Wealthmakers, which he controlled through Angelique D.  On or about March 20, 2011, Zirk de Maison caused Casablanca to enter into a purchase agreement with Angelique D. to sell her an additional 1,000,000 shares of stock in installments.

(ii)     The Fraudulent Stock Manipulations

87.     After gaining control of Casablanca's shares, Zirk de Maison, together with others devised and intended to devise a scheme whereby they fraudulently inflated Casablanca's share price and trading volume and then orchestrated the sale and purchase of both the unrestricted and restricted Casablanca stock at a profit when the share price reached desirable levels.

88.     The co-conspirators sought to manipulate the Casablanca stock through manipulative stock trading techniques to a price beneficial to the co-conspirators.  Having created the company, the co-conspirators controlled a majority of the shares outstanding, enabling them to manipulate the share price.  Those public shares were typically purchased by brokers trading in accounts belonging to clients.  Zirk de Maison also used co-conspirators to solicit potential investors to purchase restricted shares belonging to Zirk de Maison and other co-conspirators.

89.     Extending the stock's artificially inflated price allowed the co-conspirators to also sell restricted shares to investors through private placements.  For example, investors could see a

stock quoted at $5.00 per share and be willing to buy a restricted version for $2.50 per share, thinking that the stock would still be valuable when the restriction was lifted.

90. Zirk de Maison used Small Cap Resource and its promoters, including ALFAYA, ESPOSITO, Kieran Kuhn, and Kona Jones Barbera to cold call, contact, and induce potential investors to purchase shares of Casablanca. The purchases were made on the open market and through private placements at the urging of the promoters. ALFAYA, ESPOSITO, and Kona Jones Barbera coordinated with Kieran Kuhn and used stock manipulative techniques, such as match trading, to ensure their clients purchased Zirk de Maison's shares.

91. The first Casablanca pump started on or about September 22, 2010. That day, the company issued a press release touting a letter of intent to acquire a Chilean gold and copper mining company. One month later, the stock had reached a share price of approximately $10.01 per share.

92. The value of Casablanca's stock had little or no relation to its then current and future earnings potential or business operations. On or about May 13, 2011, Casablanca's market capitalization at its closing share price of approximately $8.20 per share was approximately $430,343,199 based on 52,480,878 shares outstanding. However, on or about May 16, 2011, Casablanca filed a form with the SEC, signed by Trisha M., stating as of on or about March 31, 2011, Casablanca listed approximately $6,024,225 in total assets (including intangibles such as "goodwill"), $2,586,327 in total liabilities, and a net loss of $371,691 since inception of the business. The form indicated a net loss of $291,741 for the first quarter of 2011. On or about October 9, 2013, the stock had fallen to approximately $0.05 per share.

J.    The Lustros Manipulation Scheme

    (i)    Control of the Stock

93.    Lustros first appeared as a publicly traded company in or around 2006 under the name Safari Associates, Inc., and later became Lustros in or around 2012.  According to an SEC filing, on or about April 18, 2012, Zirk de Maison was the chief executive officer and a member of the board of directors for the company.  Trisha M. was the chief financial officer and a member of the board of directors.

94.    As of on or about September 30, 2012, the authorized capital stock of Lustros consisted of 100,000,000 shares of common stock and 10,000,000 shares of preferred stock.  On or about March 9, 2012, Zirk de Maison caused Lustros to issue 60,000,000 shares of common stock to obtain the rights to a company owned primarily by Angelique D.  In or around April 2012, Zirk de Maison caused Lustros to issue 100,000 preferred shares to himself.  In or around June 2012, Zirk de Maison caused Lustros to issue an additional 181,818 shares of common stock to Angelique D.

    (ii)    The Fraudulent Stock Manipulations

95.    After gaining control of a majority of Lustros' shares, Zirk de Maison, together with others devised and intended to devise a scheme whereby they fraudulently inflated Lustros' share price and trading volume and then orchestrated the sale and purchase of the Lustros stock at a profit when the share price reached desirable levels.

96.    The co-conspirators sought to manipulate the Lustros stock through manipulative stock trading techniques to a price beneficial to the co-conspirators.  Having created the company, the co-conspirators controlled a majority of the shares outstanding, enabling them to

manipulate the share price. Zirk de Maison primarily used co-conspirators to solicit potential investors to purchase restricted shares belonging to Zirk de Maison and other co-conspirators.

97.    Zirk de Maison conspired with Small Cap Resource and its promoters, including ALFAYA, ESPOSITO, Kieran Kuhn, and Kona Jones Barbera to cold call, contact, and induce potential investors to purchase shares of Lustros. The purchases were made on the open market and through private placements at the urging of the promoters. ALFAYA, ESPOSITO, and Kona Jones Barbera coordinated with Kieran Kuhn and used stock manipulative techniques, such as match trading, to ensure their clients purchased Zirk de Maison's shares.

98.    Zirk de Maison also used Jason Cope to solicit investors to purchase stock in Lustros via private placement vehicles. Such stock was owned by Jason Cope and Zirk de Maison. The investors recruited by Jason Cope purchased millions of dollars in Zirk de Maison's and Jason Cope's shares, and Zirk de Maison paid Jason Cope undisclosed commissions on such investments.

99.    One Lustros pump started on or about October 30, 2013, when the share price was $0.16 per share after having been $1.30 per share one year earlier. Through aggressive promotion by co-conspirators and matching trades to raise volume, the co-conspirators were able to artificially inflate the stock price. Within just over a month, the shares had almost tripled in value to a share price of approximately $0.44 on or about December 5, 2013. By on or about February 7, 2014, the stock price had dropped back down to $0.15 per share, eventually falling to $0.01 per share as of January 5, 2015.

100.    The value of Lustros' stock had little or no relation to its then current and future earnings potential or business operations. On or about November 9, 2012, Lustros' market capitalization at its closing share price of approximately $1.10 per share was approximately

$77,830,303 based on 70,754,821 shares outstanding. However, on or about November 14, 2012, Lustros filed a form with the SEC, signed by Trisha M., stating as of on or about September 30, 2012, Lustros had approximately $10,545,799 in total assets (including intangibles such as "goodwill"), $3,098,404 in total liabilities, and a net loss of $3,311,969 since inception of the business. The form indicated a net loss of $1,619,343 for the third quarter of 2012. On or about September 16, 2014, the stock price had fallen to approximately $0.11 per share.

K.    The Gepco Manipulation Scheme

(i)    Control of the Stock

101.    Gepco first appeared as a publicly traded company in 2008 under the Kensington name and eventually became Gepco in 2013. According to an SEC filing, on or about May 14, 2014, Angelique D. was the executive chairman of the company, and Trisha M. was the president, chief financial officer, secretary, and a member of the board of directors.

102.    The authorized capital stock of Gepco consisted of approximately 250,000,000 shares of common stock and 15,000,000 shares of preferred stock. As of on or about March 31, 2014, no shares of preferred stock had been issued. Through convertible notes, Zirk de Maison caused Trisha M. to obtain approximately 8,000,000 shares of stock and caused Walker River to obtain approximately 8,835,480 shares. Zirk de Maison caused Gepco to grant an additional 2,000,000 shares of stock to Trisha M. in a subsequent transaction. In or around April 2013, Zirk de Maison, through Suprafin, obtained a note that was converted into approximately 27,670,000 shares of stock. In or around August 2013, Zirk de Maison, through Sunatco, obtained a note that was partially converted into an additional 2,000,000 shares of stock.

103.    The company issued 150,000,000 shares to Peter V., a close friend of Zirk de Maison, to acquire another entity created by Peter V. to facilitate business for Gepco. Zirk de Maison dictated to Peter V. how and when he sold the shares, allowing Zirk de Maison to retain control of the Gepco stock.

104.    In furtherance of the Gepco stock manipulation scheme, the co-conspirators made material omissions regarding the payment of commissions when soliciting investors.

(ii)    The Fraudulent Stock Manipulations

105.    After gaining control of Gepco's shares, Zirk de Maison, together with others devised and intended to devise a scheme whereby they fraudulently inflated Gepco's share price and trading volume and then orchestrated the sale and purchase of the unrestricted Gepco stock at a profit when the share price reached desirable levels.

106.    The co-conspirators sought to manipulate the Gepco stock through manipulative stock trading techniques to a price beneficial to the co-conspirators. Having created the company, the co-conspirators controlled a majority of the shares outstanding, enabling them to manipulate the share price. Zirk de Maison primarily utilized co-conspirators to solicit potential investors to purchase restricted shares belonging to Zirk de Maison and other co-conspirators.

107.    Zirk de Maison conspired with Gregory Goldstein to find potential investors to purchase Zirk de Maison's shares through private placements and offered Gregory Goldstein a thirty percent commission. Zirk de Maison also used Kieran Kuhn to direct his employees at Small Cap Resource to cold call potential investors and induce to invest in Gepco.

108.    The value of Gepco's stock had little or no relation to its then current and future earnings potential or business operations. On or about March 31, 2014, Gepco's market capitalization at its closing price of approximately $0.19 per share was approximately

$42,037,985 based on approximately 221,252,555 shares outstanding.  However, on or about May 14, 2014, Gepco filed a form with the SEC, signed by Trisha M. and Peter V., stating that as of on or about March 31, 2014, Gepco had accrued a net loss of $89,401 since inception and had accumulated a deficit during the development stage of approximately $458,176.  Gepco's stock was suspended from trading in September 2014 by the SEC.

L.    Profits at Investors' Expenses

109.    The co-conspirators, together with others known and unknown to the Grand Jury, obtained millions of shares in the Manipulated Public Companies at no or little cost and then profited by selling their own shares in Lenco, Kensington, Casablanca, Lustros, and Gepco stock at artificially inflated prices to investors.  Little or no portion of the investments went to fund the operations of the Manipulated Public Companies.  Rather, Defendants and their co-conspirators used most of the investors' money to enrich themselves.

110.    Co-conspirators sold their shares in the Manipulated Public Companies to investors without disclosing the payment of commissions.  Zirk de Maison typically paid, and caused the payment to, co-conspirators in amounts of between thirty and fifty percent of the total sales price of Zirk de Maison's stock that was sold with Zirk de Maison and entities that he controlled receiving the remainder of the investors' money.  Kieran Kuhn typically paid, and caused the payment to, co-conspirators that promoted for Small Cap Resource, such as ALFAYA, ESPOSITO, and Kona Jones Barbera, a portion of the commissions paid by Zirk de Maison in amounts of between five and ten percent of the total sales price.  In doing so, Defendants and others, enriched themselves and used, among other stock manipulative techniques, matched trades, to execute transactions and fraudulently inflate the price of the Manipulated Public Companies' stock.

111.    Zirk de Maison also provided shares in the Manipulated Public Companies as commission payments for participation in the conspiracy. Co-conspirators could sell the shares and keep the proceeds as additional profit for participation in the conspiracy.

112.    Commissions were not limited to cash payments and the issuance of shares to co-conspirators. Specifically, Zirk de Maison purchased jewelry and luxury automobiles and paid office rent and other expenses for the co-conspirators.

113.    The co-conspirators caused approximately $54,000,000 to be invested in the purchase of stock in the Manipulated Public Companies. Most of this money was not used to fund the actual business operations of each company but instead was diverted to enrich the co-conspirators. In all, the co-conspirators gained between hundreds of thousands to tens of millions of dollars, depending on their role, as part of their participation in the conspiracy.

### III.    STATUTORY VIOLATIONS

#### COUNT 1
(Conspiracy to Commit Securities Fraud, 18 U.S.C. § 1348;
and Wire Fraud, 18 U.S.C. § 1343; in violation of 18 U.S.C. § 1349)

The Grand Jury further charges:

114.    The allegations contained in paragraphs 1 through 113 are re-alleged and incorporated as though fully set forth herein.

115.    From on or about September 28, 2006, through on or about September 18, 2014, the exact dates being unknown to the Grand Jury, within the Northern District of Ohio, Eastern Division, and elsewhere, Defendants WILLIAM SCHOLANDER, TALMAN HARRIS, JACK TAGLIAFERRO, VICTOR ALFAYA, and JUSTIN ESPOSITO, together with others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate,

and agree with each other, and with others both known and unknown to the Grand Jury, to commit federal criminal offenses, to wit:

      a.     To defraud any person in connection with any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 and that is required to file reports under section 15(d) of the Securities Exchange Act of 1934; and to obtain, by means of false and fraudulent pretenses, representations, and promises, any money and property in connection with the purchase and sale of any security of an issuer described herein, in violation of Title 18, United States Code, Section 1348 (Securities Fraud); and

      b.     To devise and intend to devise a scheme and artifice to defraud the investors, and to obtain money by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause the transmission by means of wire communications in interstate commerce any writing, sign, signal, and picture, in violation of Title 18, United States Code, Section 1343 (Wire Fraud).

## OBJECTS OF THE CONSPIRACY

116.    The objects of the conspiracy were to:  (1) defraud the investors; (2) obtain investor monies and pay and receive undisclosed commissions; (3) inflate the value of the Manipulated Public Companies; and (4) enrich the conspirators.

## MANNER AND MEANS OF THE CONSPIRACY

117.    To attain the objects of the conspiracy, Defendants and their co-conspirators employed the following manner and means:

      a.     It was a part of the conspiracy that the co-conspirators created public "shell" companies, executed mergers of nascent businesses with the shells to create publicly traded companies, and then paid undisclosed commissions to consultants, brokers, and boiler

room promoters, in exchange for using and soliciting investor funds to purchase co-conspirators'
shares of the resulting stock.

        b.      It was a part of the conspiracy that the co-conspirators used manipulative
stock trading techniques, such as wash trades, matched trades, and marking the close trades, to
fraudulently inflate the price in the Manipulated Public Companies.

        c.      It was part of the conspiracy that Zirk de Maison agreed with co-
conspirators to sell his stock in the Manipulated Public Companies.

        d.      It was a part of the conspiracy that the co-conspirators ensured that any
time they wanted to sell free trading shares on the open market, there would be available buyers.

        e.      It was a part of the conspiracy that Zirk de Maison paid undisclosed
commissions in exchange for co-conspirators selling Zirk de Maison's shares via private
placements, purchasing them using client accounts on the open market, and inducing investors to
purchase them through calls.

        f.      It was a part of the conspiracy that the co-conspirators did not disclose to
investors the commission payments from Zirk de Maison and companies and persons he
controlled.

        g.      It was a part of the conspiracy that Zirk de Maison used registered brokers,
such as SCHOLANDER, HARRIS, and TAGLIAFERRO to liquidate free trading shares of
stock in the Manipulated Public Companies and paid the registered brokers commissions for
purchasing Zirk de Maison's shares.

        h.      It was a part of the conspiracy that Zirk de Maison used consultants, such
as Jason Cope and Louis M., to access wealthy potential investors and paid undisclosed

commissions of cash and stock to the consultants when they persuaded their clients to purchase Zirk de Maison's shares in the Manipulated Public Companies.

i.     It was a part of the conspiracy that the co-conspirators used private placements, stock promoters, and non-arms-length trading with related parties to create the illusion of volume, to inflate the stock price, and to divest their own shares.

j.     It was a part of the conspiracy that Zirk de Maison used boiler room promoters, such as ALFAYA and ESPOSITO, to cold call and solicit potential investors to purchase shares of the Manipulated Public Companies.

k.     It was a part of the conspiracy that the cold calls and solicitations to potential investors coincided with favorable press releases or other information that Zirk de Maison caused to be released.

l.     It was a part of the conspiracy that the boiler room promoters touted the Manipulated Public Companies using high pressure sales tactics and misrepresentations about the value of the Manipulated Public Companies and their stock.

m.     It was a part of the conspiracy that the boiler room promoters did not disclose that Zirk de Maison and Kieran Kuhn paid commissions to them on the sale of Zirk de Maison's stock to the investors, either on the open market or through private placements.

n.     It was a part of the conspiracy that the co-conspirators used attorneys to draft Rule 144 legal opinions containing misrepresentations to satisfy legal requirements about depositing the stock and lifting restrictions.

o.     It was a part of the conspiracy that to conceal the payment of undisclosed commissions, co-conspirators commonly directed Zirk de Maison to transfer such money to

entities and third parties to avoid the appearance of a direct payment from Zirk de Maison to that co-conspirator.

        p.     It was a part of the conspiracy that to further hide the undisclosed commission payments, Zirk de Maison made, and caused to be made, payments to co-conspirators and others from a variety of companies he controlled, including Bridges, SB3, Suprafin, and Wealthmakers, instead of using the Manipulated Public Companies' and Zirk de Maison's personal bank accounts.

        q.     It was a part of the conspiracy that Zirk de Maison communicated with the co-conspirators and others via interstate wires, including through e-mail transmissions, to record commission payments that were made and owed.

        r.     It was a part of the conspiracy that Zirk de Maison transmitted, and caused the transmission of, interstate wires in the form of undisclosed commission payments to co-conspirators for participating in the conspiracy.

        s.     It was a part of the conspiracy that co-conspirators received shares, both restricted and free-trading, of various stock from Zirk de Maison to compensate co-conspirators for participating in the conspiracy.

## ACTS IN FURTHERANCE OF THE CONSPIRACY

      118.    In furtherance of the conspiracy and to effect its unlawful objects, Defendants and their co-conspirators committed, and caused to be committed, the following acts in furtherance of the conspiracy in the Northern District of Ohio, and elsewhere:

        a.     On or about December 13, 2007, Zirk de Maison caused funds in the amount of approximately $10,100 to be wire transferred from a Royce account ending in x1581

held in Redlands, California, at City National Bank, to an account in the name of Sara U., for the benefit of HARRIS, in New York, New York, at Citibank.

      b.     On or about September 2, 2008, Zirk de Maison caused funds in the amount of approximately $20,700 to be wire transferred from an SB3 account ending in x7565 held in San Diego, California, at City National Bank, to an account controlled by Herman P., for the benefit of SCHOLANDER, in New York, at Citibank.

      c.     On or about October 4, 2008, Zirk de Maison caused to be sent an e-mail to SCHOLANDER and HARRIS with the subject line "FW: DTC Sheets," stating "Here are the DTC shetts [sic] for last week. You are selling shares again. 1000 last week and 3100 this week. That is 4100 at $5 which is $20500.00 and at 40% you owe me $8040.00."

      d.     On or about May 12, 2009, TAGLIAFERRO caused approximately $86,014 worth of Lenco stock to be purchased in William C.'s client account for which TAGLIAFERRO was a registered representative.

      e.     On or about May 12, 2009, TAGLIAFERRO caused approximately $49,925 worth of Lenco stock to be purchased in William C.'s client account for which TAGLIAFERRO was a registered representative.

      f.     On or about May 12, 2009, Zirk de Maison caused funds in the amount of approximately $76,933 to be wire transferred from a Bridges account ending in x9297 held in Redlands, California, at Washington Mutual Bank, to an account in the name of Red Eye Express, Inc., for the benefit of TAGLIAFERRO in Rockville Center, New York, at The First National Bank of Long Island.

      g.     On or about May 23, 2009, Zirk de Maison caused to be sent an e-mail to Gregory Goldstein and others with the subject line "Steve W and the Mother Fu--ers from NY,"

stating "The Scum from New York got 50% commission and I paid another 5% and then they sold back 25,000 shares back the next f---ing week. . .The scum from New York has now on 2 occasions bought stock, got commission and fu--ed us in less than 7 days."

  h. On or about November 24, 2009, Zirk de Maison caused funds in the amount of approximately $10,000 to be wire transferred from a Wealthmakers corporate bank account ending in x8413 held in San Diego, California, at City National Bank, to an SMI account controlled by Jason Cope and held in Westlake, Ohio, at U.S. Bank.

  i. On or about January 7, 2010, Zirk de Maison caused funds in the amount of approximately $12,000 to be wire transferred from a Suprafin bank account at Wachovia held in Santee, California, at U.S. Bank, to an account in the name of SMI for the benefit of Jason Cope and held in Westlake, Ohio, at U.S. Bank.

  j. On or about March 3, 2010, HARRIS caused $35,056 worth of Lenco stock to be purchased in Robert W.'s client account at First Merger Capital for which HARRIS was the sole registered representative.

  k. On or about May 21, 2010, TAGLIAFERRO caused $23,072 worth of Kensington stock to be purchased in Janet Q.'s client account for which TAGLIAFERRO was a registered representative.

  l. On or about May 21, 2010, TAGLIAFERRO caused $19,012 worth of Kensington stock to be purchased in Janet Q.'s client account for which TAGLIAFERRO was a registered representative.

  m. On or about May 24, 2010, Zirk de Maison caused funds in the amount of approximately $12,400 to be wire transferred from a Suprafin account held in Santee, California,

at Wachovia, to an account in the name of Global Marketing Consultants, for the benefit of

TAGLIAFERRO in Cheyenne, Wyoming, at Chase Bank.

   n.  On or about June 3, 2010, SCHOLANDER caused $27,000 worth of

Lenco stock to be purchased in Raymond K.'s client account at First Merger Capital for which

SCHOLANDER was listed as one of the registered representatives.

   o.  On or about June 4, 2010, SCHOLANDER caused an e-mail to be sent to

Zirk de Maison with the subject line "Please Review," attaching an e-mail involving Thomas F.,

a client at First Merger Capital, with a discussion about the business model of Lenco quickly

becoming obsolete and not a good investment.

   p.  On or about June 4, 2010, Zirk de Maison caused funds in the amount of

approximately $50,000 to be wire transferred from a Kensington corporate bank account ending

in x4134 held in Santee, California, at Wachovia Bank, to a Worldbridge account controlled by

Jason Cope and held in Westlake, Ohio, at U.S. Bank.

   q.  On or about June 4, 2010, Zirk de Maison caused funds in the amount of

approximately $50,000 to be wire transferred from a Kensington corporate bank account held in

Santee, California, at Wachovia Bank, to a Worldbridge account controlled by Jason Cope and

held in Westlake, Ohio, at U.S. Bank.

   r.  On or about August 27, 2010, HARRIS caused $4,400 worth of Lenco

stock to be purchased in Thomas F.'s client account at First Merger Capital for which HARRIS

was listed as one of the registered representatives.

   s.  On or about September 13, 2010, Zirk de Maison caused an email to be

transmitted with the subject line "[c]ommissions [p]aid," with an attached spreadsheet that

detailed the undisclosed commission payments made to SCHOLANDER, HARRIS, TAGLIAFERRO, Stephen Wilshinsky, Gregory Goldstein and others.

t. On or about September 23, 2010, Zirk de Maison caused funds in the amount of approximately $102,300 to be wire transferred from a Bridges account ending in x9797 held in Santee, California, at JPMC, to an account in the name of the Global Marketing held in Cheyenne, Wyoming, at JPMC, for the benefit of TAGLIAFERRO.

u. On or about September 30, 2010, HARRIS caused $9,100 worth of Lenco stock to be purchased in Scott R.'s client account at First Merger Capital for which HARRIS was the sole registered representative.

v. On or about October 1, 2010, HARRIS caused $20,540 worth of Lenco stock to be purchased in Scott R.'s client account at First Merger Capital for which HARRIS was the sole registered representative.

w. On or about October 4, 2010, Zirk de Maison caused funds in the amount of approximately $23,400 to be wire transferred from a Suprafin bank account at Wachovia held in Santee, California, at U.S. Bank, to an account in the name of Sara H. for the benefit of HARRIS and held in New York, New York, at Citibank.

x. On or about November 2, 2010, Zirk de Maison caused funds in the amount of approximately $22,000 to be wire transferred from a Suprafin account ending in x9320 held in Santee, California, at Wachovia, to an account in the name of Sara H., for the benefit of HARRIS, held in New York, New York, at Citibank.

y. On or about November 19, 2010, Zirk de Maison caused an email to be sent to SCHOLANDER, HARRIS, Jason Cope and others regarding Lenco's recent business activity.

z.      On or about June 9, 2011, TAGLIAFERRO, using the pseudonym "Jack Taylor," caused an e-mail to be sent to Zirk de Maison, stating "These are my clients that still own Kennsigton [sic]. Here are their names and addresses with # of shares."

aa.     On or about July 16, 2011, Zirk de Maison caused to be sent an email to HARRIS, TAGLIAFERRO, Jason Cope, and others stating that the Casablanca website was going live.

bb.     On or about November 22, 2011, Zirk de Maison caused funds in the amount of approximately $5,000 to be wire transferred from a Suprafin account ending in x9320 held in Santee, California, at Wells Fargo, to an account in the name of Small Cap Resource, held in Port Washington, New York, at JPMC, for the benefit of Kieran Kuhn.

cc.     On or about December 22 and December 23, 2011, Zirk de Maison caused funds in the total amount of approximately $250,000 (in two separate wires of $60,000 and $190,000 respectively) to be wire transferred from a Suprafin account ending in x9320 held in Santee, California, at Wells Fargo, to an account in the name of Worldbridge Partners, Inc. held in Westlake, Ohio, at US Bank, for the benefit of Jason Cope.

dd.     On or about February 21, 2012, TAGLIAFERRO caused funds in the amount of approximately $15,000 to be wire transferred from a SMI account ending in x3689 held in Gates Mills, Ohio, at U.S. Bank, to an account in the name of Global Marketing, held in Cheyenne, Wyoming, at JPMC, for the benefit of TAGLIAFERRO.

ee.     On or about March 2, 2012, Louis M. caused funds in the amount of approximately $10,000 to be wire transferred from a Traverse account ending in x5234 held in Bay Village, Ohio, at Fifth Third Bank, to an account in the name of Small Cap Resource ending in x3820 held in Port Washington, New York, at JPMC, for the benefit of Kieran Kuhn.

ff.     On or about April 14, 2012, Zirk de Maison caused an email to be sent to HARRIS, Jason Cope, and others regarding Lustros documents and operations.

gg.     On or about June 19, 2012, Kieran Kuhn caused an email to be sent to Zirk de Maison with a subject line of "the numbers," detailing the various investors that his company obtained for Zirk de Maison and stating, in part, "For the bonus last night you agreed to 100 casa. That is strictly for my guys none are for me. But you can issue them to me if you like and I can stay in control of them. Whatever you want. Those are obviously restricted." After noting the interaction with another investor, Kieran Kuhn further stated in the e-mail, "That should be about 55 casa. If you want to use some of those for my bonus to the guys that's fine, but I never got any casa shares yet (besides the one you sent me recently) and would love to have some skin the game as well which is why I'm bringing it up."

hh.     On or about June 29, 2012, TAGLIAFERRO caused funds in the amount of approximately $7,500 to be wire transferred from a Worldbridge account ending in x6988 held in Gates Mills, Ohio, at U.S. Bank, to an account in the name of Global Marketing, held in Cheyenne, Wyoming, at JPMC, for the benefit of TAGLIAFERRO.

ii.     On or about August 10, 2012, Zirk de Maison caused an email to be sent to SCHOLANDER, HARRIS, Jason Cope and others regarding a change in his cell phone number and that he was back in California on a full time basis.

jj.     On or about August 29, 2012, Kieran Kuhn caused check number 1489 in the amount of approximately $45,000 drawn on the Small Cap Resource account ending in x3820 to be paid to Neoterra for the benefit of Kona Jones Barbera.

kk.    On or about September 7, 2012, Kieran Kuhn caused check number 1509 in the amount of approximately $67,500 drawn on the Small Cap Resource account ending in x3820 to be paid to Esposito Consulting for the benefit of ESPOSITO.

ll.    On or about November 21, 2012, Zirk de Maison caused funds in the amount of approximately $8,000 to be wire transferred from a Suprafin account ending in x8503 held in Santee, California, at U.S. Bank, to an account in the name of SCHOLANDER, held in New York, New York, at Capital One Bank.

mm.    On or about January 7, 2013, ESPOSITO caused to be sold $875 worth of Lustros stock in an account in his name at Interactive Brokers, LLC.

nn.    On or about January 15, 2013, ESPOSITO caused to be sold $4,255 worth of Lustros stock in an account in his name at Interactive Brokers, LLC.

oo.    On or about March 1, 2013, ALFAYA caused to be sent an e-mail to Kieran Kuhn with an attachment for a private placement of Lustros stock he sold to investor Charles M. wherein Charles M. purchased 45,000 shares of Lustros at a total price of $20,250 through a private placement agreement with Walker River.

pp.    On or about March 1, 2013, Kieran Kuhn caused check number 1698 in the amount of approximately $3,000 drawn on the Small Cap Resource account ending in x3820 to be paid to ALFAYA.

qq.    On or about March 8, 2013, Kieran Kuhn caused check number 1706 in the amount of approximately $5,000 drawn on the Small Cap Resource account ending in x3820 to be paid to ALFAYA.

rr.    On or about November 26, 2013, Val W., a relative of a Lustros investor, caused to be sent an e-mail to ALFAYA, stating "Victor, when we learned dad shared his

41

account and password with your rep we decided to change dad's Scottrade account and password. Please understand where I am coming from. I mean no disrespect to you or your company. But dad is 95 years old and he is 'frustratingly trusting.' When he tried to tell me what he had done (the purchase of stocks) he could not recall the details, even though he had taken notes."

ss. On or about March 31, 2014, Zirk de Maison caused to be sent an e-mail to a prospective investor, Aron A., providing him with the contact information of "the people who have invested in most of my deals." Zirk de Maison further noted that "all of them have invested in the Gepco private placement." Zirk de Maison listed six "investors" and their contact information for Aron A. The "investors" provided by Zirk de Maison as references included ALFAYA, Jason Cope, Gregory Goldstein, Kieran Kuhn, and Louis M.

All in violation of Title 18, United States Code, Section 1349.

COUNTS 2–4
(Wire Fraud, 18 U.S.C. § 1343)

The Grand Jury further charges:

119. The allegations contained in paragraphs 1 through 113, and the factual allegations contained in paragraphs 117 and 118, are re-alleged and incorporated as though fully set forth herein.

120. From on or about September 28, 2006, through on or about September 18, 2014, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants WILLIAM SCHOLANDER, TALMAN HARRIS, and JACK TAGLIAFERRO, knowingly devised, and intended to devise, a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

42

121.    On or about the dates listed below, in the Northern District of Ohio, Eastern

Division, and elsewhere, Defendants, for the purpose of executing and attempting to execute the

foregoing scheme and artifice, transmitted and caused to be transmitted, writings, signs, signals,

pictures, and sounds by means of wire and radio communication, in interstate commerce, to wit;

electronic communications that Defendants caused to be sent, and received, from Zirk de Maison

in California, to Gates Mills, Ohio, and elsewhere, as described below:

| COUNT | DATE | DEFENDANT | SENT FROM | RECEIVED IN |
|---|---|---|---|---|
| 2 | 11/19/2010 | SCHOLANDER, HARRIS | California | Ohio, New York |
| 3 | 07/16/2011 | HARRIS, TAGLIAFERRO | California | Ohio, New York |
| 4 | 04/14/2012 | HARRIS | California | Ohio, New York |

All in violation of Title 18, United States Code, Section 1343.

### COUNTS 5–6
(Wire Fraud, 18 U.S.C. § 1343)

The Grand Jury further charges:

122.    The allegations contained in paragraphs 1 through 113, and the factual allegations

contained in paragraphs 117 and 118, are re-alleged and incorporated as though fully set forth

herein.

123.    From on or about September 28, 2006, through on or about September 18, 2014,

in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant JACK

TAGLIAFERRO, knowingly devised, and intended to devise, a scheme and artifice to defraud

and to obtain money and property by means of false and fraudulent pretenses, representations,

and promises.

43

124.     On or about the dates listed below, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant JACK TAGLIAFERRO, for the purpose of executing and attempting to execute the foregoing scheme and artifice, transmitted and caused to be transmitted, writings, signs, signals, pictures, and sounds by means of wire and radio communication, in interstate commerce, to wit;  electronic transfers of funds, in the approximate amounts described below, from accounts described below located in the Northern District of Ohio, into accounts controlled by Defendant, located in Wyoming:

| COUNT | DATE | AMOUNT | ORIGINATING BANK | RECEIVING BANK |
|-------|------|--------|------------------|----------------|
| 5 | 02/21/2012 | $15,000 | U.S. Bank, Ohio | JPMC, Wyoming |
| 6 | 06/29/2012 | $7,500 | U.S. Bank, Ohio | JPMC, Wyoming |

All in violation of Title 18, United States Code, Section 1343.

Original document - - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002